# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

LYNETTE MOORE,

                    Plaintiff,

v.

DENA HUNT and
MILWAUKEE COUNTY,

                    Defendants.

Case No. 14-CV-1101-JPS

ORDER

The plaintiff, Lynette Moore, alleges that her Section 8 housing benefits were terminated in violation of her rights under the Constitution and various federal statutes. (*See* Docket #8 ¶¶ 47–73). She has named two defendants: Milwaukee County ("the County"), which operates the Milwaukee County Housing Choice Voucher Program ("the Program") through the Milwaukee County Housing Authority ("MCHA"), and through which Ms. Moore received her housing benefits; and Dena Hunt, a County employee who manages the Program. (*See, e.g.*, Docket #28 ¶¶ 9–10).

The parties have cross-moved for summary judgment (Docket #55, #60), and their motions are now fully briefed (Docket #56, #61, #72, #76, #77, #86). The Court, thus, turns to decide them.

1.      BACKGROUND

The Court begins with some background discussion, first offering a summary of the Program and the system in which it operates, then discussing the specific facts of this case, and finally discussing Ms. Moore's specific claims.

1.1      The Program and the Section 8 System

The Seventh Circuit has provided a thorough overview of Section 8 housing voucher programs. *See Khan v. Bland*, 630 F.3d 519, 523–24 (7th Cir.

2010). Most of that overview applies to the Program operated by MCHA, which is specifically at issue in this case. *See id.* Thus, the Court—with some minor alterations to make the overview applicable to the Program—quotes the Seventh Circuit's overview at length:

> The Section 8 Housing Choice Voucher Program provides rental assistance to low-income families to enable them to participate in the private rental market. This program is administered by [the Department of Housing and Urban Development ("HUD")]. 42 U.S.C. § 1437f(o); 24 C.F.R. pt. 982. Although funded by the federal government, it is generally administered by state or local government entities known as public housing agencies (PHAs). 24 C.F.R. § 982.1(a). A PHA must comply with HUD regulations and other HUD requirements for the program. 24 C.F.R. § 982.52(a). Federal regulations require PHAs to adopt written administrative plans that establish local policies for administration of the program in accordance with HUD requirements. 24 C.F.R. § 982.54.
>
> [The MCHA] is the local PHA that administers the Section 8 program for [Milwaukee, Wisconsin].…
>
> Eligibility for the Section 8 housing voucher is determined by income. 24 C.F.R. § 982.201. Qualified participants pay a percentage of their income toward rent and utilities and receive subsidies for the balance of the rental payment. 42 U.S.C. § 1437f. The participant's portion of the rent cannot exceed forty percent of his or her monthly adjusted income. 24 C.F.R. § 982.305(a). The subsidized portion of the rent is paid by the PHA to the rental property owner (the "person…with the legal right to lease…a unit to a participant" under the program, 24 C.F.R. § 982.4) pursuant to [a Housing Assistance Payment ("HAP")] contract. Once a PHA determines that a participant is eligible and that there is available space in the program, the PHA issues the participant a voucher and the participant can search for housing. 24 C.F.R. §§ 982.202, 982.302.

If a property owner agrees to lease a unit to a tenant under the program, he must enter into an HAP contract with the PHA. The HAP contract is prescribed by HUD and specifies the maximum monthly rent an owner may charge. 42 U.S.C. § 1437f(c)(1). Before the PHA enters into an HAP contract, the PHA must determine that the cost of the unit is reasonable and meets HUD's prescribed housing quality standards (HQS). 42 U.S.C. § 1437f(o)(8); 24 C.F.R. § 982.305(a); 24 C.F.R. § 982.401. The HAP contract provides that it "shall be interpreted and implemented in accordance with HUD requirements, including the HUD program regulations at 24 Code of Federal Regulations Part 982." HUD–52641, Part B (3/2000), ¶ 16(b). The Section 8 participant enters into a separate lease with the owner that must meet certain requirements pursuant to 42 U.S.C. § 1437f(o)(7). For example, the lease must include the required tenancy addendum. 24 C.F.R. § 982.305(a). The housing must also be inspected annually to ensure that it continues to meet the HQS. 42 U.S.C. § 1437f(o)(8)(B)-(D). Tenants must also re-certify family income and composition annually to continue in the program. 24 C.F.R. § 982.516.

*Khan*, 630 F.3d at 523-24. To summarize, as best as the Court can:

(1) the MCHA, through the Program, administers the Section 8 benefits for the Milwaukee County area, on behalf of HUD and must comply with all HUD regulations and requirements;

(2) individuals who would like Section 8 benefits apply to the Program;

(3) once that individual is selected for participation in the Program—when the individual is eligible and there is available space—MCHA issues that individual a voucher;

(4) the individual—now a Program participant—then searches for housing;

(5) when the participant finds housing that the property owner is willing to rent to the participant, the property owner must enter two separate contracts:

<blockquote>

(a) the lease with the participant; and

(b) the HAP contract with MCHA, which is "interpreted and implemented in accordance with" all HUD requirements and regulations;

(6) once those contracts are in place, the participant pays a portion of the rent for the unit directly to the owner and MCHA pays the remainder, also directly to the owner; and

(7) each year, MCHA must inspect the unit to ensure that it meets quality standards and the participant must re-certify his or her family income and composition.

</blockquote>

*Id.*

## 1.2 Case-Specific Facts

Ms. Moore's interactions with MCHA, in the context of the system described above, form the basis for this lawsuit. And, while there are significant amounts of disputes between the parties as to the facts, there appear to be few *material* disputes.

Ms. Moore has received Section 8 housing assistance through the Program since 2002. (PPFF ¶ 10).[1] From 2008 until May of 2014, she lived at 4882 Dean Road in Brown Deer, Wisconsin ("the Dean Road property"). (PPFF ¶ 11). Lunsinga Msikinya owned the Dean Road property. (DPFF ¶ 14 (plaintiff disputes other portions of this proposed finding)). Thus, because Ms. Moore was a participant in the Program, she would pay Mr. Msikinya a small amount in rent and MCHA would pay Mr. Msikinya the remainder. (*See* PPFF ¶ 10; DPFF ¶ 16 (plaintiff disputes other portions of this proposed

---

[1] The Court will refer to the plaintiff's proposed findings of fact (Docket #57) as "PPFF." Likewise, it will refer to the defendants' proposed findings of fact (Docket #62) as "DPFF." In turn, it will refer to the plaintiff's and defendants' responses to proposed findings (Docket #74, #75, respectively) as "Pl. Resp. to DPFF" and "Def. Resp. to PPFF," respectively. The Court will parenthetically note any factual disputes between the parties where they exist.

Case 2:14-cv-01101-JPS   Filed 08/20/15   Page 4 of 24   Document 87

finding)). For example, prior to February 5, 2014, Ms. Moore was obligated to pay Mr. Msikinya $25.00 per month, and MCHA would pay the remainder. (DPFF ¶ 16 (plaintiff disputes other portions of this proposed finding)).

On February 5, 2014, however, Ms. Moore's rent obligations changed substantially: as a result of a change in her family composition, *see* 24 C.F.R. §§ 982.505, 982.516, her rent contribution was increased to $413.00. (DPFF ¶ 16; Pl. Resp. to DPFF ¶ 16). Apparently, she failed to pay this increased amount when it came due on March 1, 2014. (*See* DPFF ¶ 18; Pl. Resp. to DPFF ¶ 18 (arguing that Ms. Moore was not required to pay this amount, "because Moore's rent obligation to her landlord at the Dean Road address for March, 2014, was only $25," but failing to support that contention or dispute the fact that Ms. Moore had not, in fact, paid the required $413.00)). Thus, Mr. Msikinya issued Ms. Moore a five-day notice for failure to pay the required $413.00. (DPFF ¶ 19; Pl. Resp. to DPFF ¶ 18). That notice required Ms. Moore to vacate the Dean Road property if she failed to pay the required $413.00. (DPFF ¶ 20 (plaintiff disputes only the date on which Ms. Moore would be required to vacate the premises)).

Ms. Moore did not pay that amount, so Mr. Msikinya filed an eviction action against her. (DPFF ¶ 49 (plaintiff disputes only the date that the judgment of eviction was entered)). Ms. Moore appeared at a May 22, 2014, hearing regarding her eviction. (Docket #66, Ex. 1 (Moore Depo.) 133:2–13). It appears that, at that hearing, she admitted to the presiding judge that she had not paid the rent and could not do so. (Docket #66, Ex. 1, 137:19–20 ("The first thing, if you got the money, I said no. So he granted it.")). So, the presiding judge issued a judgment of eviction against her. (DPFF ¶ 49 (plaintiff disputes only the date that the judgment of eviction was entered)).

Between the time that Mr. Msikinya issued the five-day notice and the entry of eviction, Ms. Moore and Mr. Msikinya were both in touch with Andy Collura, an MCHA employee who had primary responsibility for managing Ms. Moore's Section 8 benefits. (*E.g.*, DPFF ¶¶ 21, 30). The parties largely dispute what the parties said in these conversations and the timeline of events that followed, but a few things are clear. First, through those conversations, Mr. Collura learned that Mr. Msikinya planned to terminate Ms. Moore's lease at the Dean Road property. (*See, e.g.*, DPFF ¶¶ 25–27). Second, Mr. Collura was under the (potentially erroneous) assumption that, because Ms. Moore was required to leave the Dean Road property but presumably still wanted to participate in the Program, she would need a "moving packet"; thus, on April 18, 2014, Mr. Collura issued a moving packet, which included a voucher giving Ms. Moore until June 17, 2014, to locate housing. (*See, e.g.*, PPFF ¶¶ 14–16; DPFF ¶ 39–43). Third, at some point (perhaps before, shortly after, or long after issuance of the moving packet), Mr. Collura informed Ms. Moore that the moving packet was available for her to pick up from the front desk of his office; he did not mail the packet to her and may not have explained the importance of the voucher included in the moving packet. (*See, e.g.*, PPFF ¶¶ 14–16; DPFF ¶ 39–43; Pl. Resp. to DPFF ¶ 48).

Ms. Moore never picked up the moving packet or voucher; thus, the voucher expired on June 17, 2014, without Ms. Moore having located a new place to live. (PPFF ¶ 22).

That same day, Ms. Moore went to MCHA's offices, concerned that she was going to be homeless; while there, she met with two MCHA employees. (PPFF ¶¶ 23–24). First, she met with Jackie Martinez, who explained that Ms. Moore would be terminated from the program because

she had been evicted. (PPFF ¶ 25). Ms. Moore then met with Ms. Hunt, who also stated that Ms. Moore would be terminated from the program if she had been evicted. (PPFF ¶ 26).

On June 19, 2014, Ms. Moore faxed MCHA a written request for a hearing regarding her benefits. (PPFF ¶ 29).

On June 20, 2014 (or, perhaps, before), MCHA issued the first of three participant termination letters ("the First Letter") to Ms. Moore. (PPFF ¶ 30; DPFF ¶ 56). This letter was (for unclear reasons) backdated to May 30, 2014, and stated that Ms. Moore's benefits were being terminated effective June 18, 2014, for two reasons: (1) "[t]he Participant has been evicted from their unit"; and (2) "[t]he Participant also failed to locate suitable rental housing within the time allowed on the Voucher." (Docket #47, Ex. 4; PPFF ¶¶ 30–32; DPFF ¶¶ 56). The First Letter also stated that Ms. Moore had the right to request an informal hearing within 10 days if she wished to dispute her termination from the Program. (PPFF ¶ 33).

On June 23, 2014, Ms. Moore's attorney emailed Ms. Martinez, asking whether Moore would receiving a hearing as she had requested; Martinez did not respond. (PPFF ¶ 34 (defendant's objections do not relate to the substance of this fact)).

In fact, instead of responding to Ms. Moore's request for a hearing, MCHA issued a second participant termination letter ("the Second Letter"). (PPFF ¶ 35 (defendant's objections do not relate to the substance of this fact)). Ms. Martinez gave the Second Letter directly to Ms. Moore's attorney on June 24, 2014. (PPFF ¶ 36). The Second Letter differed from the First Letter in three material respects: (1) the Second Letter was dated June 18, 2014, whereas the First Letter was inexplicably backdated to May 30, 2014; (2) the Second Letter listed a single reason for termination: "[t]he Participant failed

to locate suitable rental housing within the time allowed on the voucher"; and (3) the Second Letter stated that Ms. Moore did not have the right to request an informal hearing. (PPFF ¶¶ 37, 38). The defendants assert that Ms. Hunt changed the reason for termination in order to allow Ms. Moore the opportunity to re-apply for benefits; Ms. Moore disagrees, asserting that Ms. Moore changed the reason to prevent Ms. Moore from receiving a hearing. (PPFF ¶ 43; DPFF ¶ 66).

Ms. Moore's attorney persisted in her requests for a hearing. (PPFF ¶¶ 44–46). Ms. Hunt repeatedly rejected those requests, stating that a pre-termination hearing was not necessary when benefits were terminated on the basis of a participant's having allowed a voucher to expire. (PPFF ¶ 44–52; DPFF ¶ 67). Ms. Moore's attorney also requested an extension of Ms. Moore's moving voucher. (DPFF ¶ 68). Ms. Hunt determined that the grant of an extension was discretionary, and denied the request. (DPFF ¶ 69). In denying the request for an extension, Ms. Hunt explained that Ms. Moore had not turned in any requests for approval of a new unit and would have difficulty locating a new unit in light of the fact that she now had an eviction on her record. (DPFF ¶ 71). Ms. Hunt informed Ms. Moore's attorney that the denial of an extension was unreviewable. (DPFF ¶ 72). Yet, whether to contest the denial of the extension or (much more likely) the reasons for termination, Ms. Moore's attorney continued to request a hearing throughout July and August of 2014. (DPFF ¶¶ 73, 74).

Then, on August 18, 2014, MCHA issued yet another participant termination letter to Ms. Moore ("the Third Letter"). (PPFF ¶ 53). The Third Letter again contained several material differences: (1) the Third Letter was dated on the actual date of issuance (August 18, 2014), whereas both of the previous letters had been backdated; (2) the Third Letter changed the date of

termination from June 18, 2014, to June 30, 2014; (3) the Third Letter listed a single reason for termination, but changed the reason to Ms. Moore's having been evicted; and (4) the Third Letter stated that Ms. Moore had the right to request a hearing. (PPFF ¶¶ 53, 54). The defendants assert that they issued the Third Letter and changed the reason for termination in order to allow Ms. Moore to receive a hearing. (DPFF ¶ 75 ("Because of Attorney Donahoe's continued 'adamant' insistence that Moore be terminated from the Sec. 8 program for a specific ground that would allow her an informal hearing, MCHA issued a replacement Participant Termination Letter, dated August 18, 2014, notifying Moore that her benefits would be terminated effective June 30, 2014, because of her eviction.")). Ms. Hunt testified that she (perhaps mistakenly) did not believe that Ms. Moore was entitled to a hearing if terminated for letting her voucher expire, but *would* be entitled to a hearing if terminated for her eviction. (Docket #67, 199:5–19). Thus, according to Ms. Hunt, because Ms. Moore's attorney was "adamant" in her request for a hearing, Ms. Hunt issued the Third Letter, changing the reason for termination to one that would allow for a hearing. (Docket #67, 199:5–19). Ms. Moore disputes that assertion. (Pl. Resp. to DPFF ¶¶ 75, 76).

Regardless of the reason for the change, the result was the same: Ms. Moore received a hearing. (PPFF ¶¶ 55–56). After receiving the Third Letter, Ms. Moore's attorney requested a hearing, and MCHA held that hearing on October 2, 2014. (PPFF ¶¶ 55–56). That hearing, however, was limited to addressing Ms. Moore's eviction as the basis for her termination from the Program (although much other evidence, specifically as relates to Ms. Moore's expired voucher, was introduced). (PPFF ¶ 58; *see* Docket #36, Ex. 1 at 3). On October 29, 2014, MCHA's hearing officers issued a decision upholding the termination of Ms. Moore's participation in the Program.

(Docket #36, Ex. 1). That decision found that Ms. Moore had provided the certified mail envelope showing service of notice of her eviction hearing on April 1, 2014, and that Ms. Moore attended the eviction hearing. (Docket #36, Ex. 1 at 2–3). At the eviction hearing, Ms. Moore was found to have violated the terms of her lease by holding over her unit. (*See* Docket #36, Ex. 1 at 1–2 (citing record in Wisconsin Circuit Court Case No. 2014SC012424)). The MCHA hearing officers listed Ms. Moore's violation as: "Participant violated the terms of her lease by holding over leading to eviction. Eviction due to repeated or serious lease violations is a mandatory reason for termination of assistance in accordance with Chapter 12 of the MCVP Administrative Plan and 24 CFR 982.552(b)(2) and 24 CFR 5.2005(c)(1)." (Docket #36, Ex. 1 at 1). They concluded that MCHA was "required to terminate assistance to Ms. Moore," and thus upheld MCHA's decision to do so. (Docket #36, Ex. 1 at 3).

Ms. Moore appealed that decision to the Milwaukee County Administrative Review Committee, which affirmed. (DPFF ¶¶ 85–86). She then filed suit in Milwaukee County Circuit Court, challenging the affirmance; that suit remains pending. (DPFF ¶¶ 87–89). (It does not, however, require the Court to abstain from hearing this case. (*See* Docket #51).)

### 1.3    Ms. Moore's Claims in This Case

Ms. Moore filed this case on September 10, 2014, after she had been issued the Third Letter but before she had appeared for the MCHA hearing. (Docket #1). She filed an amended complaint on September 18, 2014, in which she alleges three claims for relief:

(1)    that the County and Ms. Hunt failed to provide Ms. Moore with "a prompt pre-termination hearing in violation of the Due Process Clause of the 14th Amendment and federal law [42 U.S.C. § 1437d(k) and 24 C.F.R. §§ 982.555(a)(1)(v), 982.552(a)(3)]" (Docket #28 ¶¶ 52–56);

(2)    that the County and Ms. Hunt terminated Ms. Moore from the Program on the impermissible ground of failing to locate suitable housing before the expiration of her voucher (Docket #28 ¶¶ 57–62); and

(3)    that the County and Ms. Hunt "violated Ms. Moore's federal right regarding the issuance, term, and extension of her voucher," by:

(a)    issuing a voucher without Ms. Moore's request (Docket #28 ¶ 64(a));

(b)    failing to inform Ms. Moore that a voucher had been issued (Docket #28 ¶ 64(b));

(c)    denying Ms. Moore's request for an extension of her voucher (Docket #28 ¶ 64(c));

(d)    failing to issue a written response to Ms. Moore's request for an extension (Docket #28 ¶ 64(d)); and

(e)    failing "to consider the factors listed in [MCHA's] Administrative Plan regarding when an extension should be granted" (Docket #28 ¶ 64(e)).

Ms. Moore brings these claims under 42 U.S.C. § 1983 (Docket #28 ¶ 5), which of course creates a cause of action against any person who, under color of law "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws," 42 U.S.C. § 1983.

Ms. Moore has not specifically alleged a *Monell* claim against the County, but the parties proceed as if she has. *See Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978). And, to be sure, she has alleged that

the County has a "policy" or "practice" at numerous points, as is necessary to state a *Monell* claim. *(See* Docket #28 ¶¶ 54, 58, 60, 64)). So, the Court will also consider a *Monell* claim against the County.

Finally, Ms. Moore seeks various forms of relief: (1) a declaratory judgment holding that the defendants' actions were unconstitutional and/or violated HUD regulations; (2) a temporary and/or permanent injunction reinstating Ms. Moore's housing benefits and participation in the Program; (3) costs and reasonable attorneys' fees under 42 U.S.C. § 1988; and (4) "a Writ of Certiorari" reversing "Defendants' decision to terminate Plaintiff from the Program, thereby requiring Defendants to issue a voucher to Plaintiff." (*See* Docket #28 at 14–15). But, Ms. Moore *may not* actually be seeking that relief now: in response to the Court's request for briefing on the issue of abstention, Ms. Moore informed the Court that, if this Court were to reinstate Ms. Moore, that "reinstatement would be retroactive and for a limited period of time—only from the time the Defendants initially violated Moore's rights to the time they issued a written hearing decision." (Docket #37). It is not clear exactly how this would operate—Ms. Moore's claims are very confusing—but, in any event, it does not seem that the requested relief makes a difference to the outcome, as the Court will next discuss.

2.    ANALYSIS

The Court now turns to its analysis of the parties' cross-motions for summary judgment.

Ms. Moore has moved for partial summary judgment; she argues that she "is entitled to judgment as a matter of law that MCHA and Dena Hunt violated her due process rights to a pre-termination notice and hearing. Thus, Moore seeks summary judgment on MCHA's and Hunt's liability, pursuant to 42 U.S.C. 1983." (Docket #56 at 2). It is not entirely clear what Ms. Moore

means, but it seems that she is requesting summary judgment on only her first claim, insofar as that claim relates to an alleged due process violation by Ms. Hunt and the County. (*See* Docket #28 ¶¶ 52–56).

The defendants, meanwhile, have moved for summary judgment on each of Ms. Moore's claims. (Docket #60).

### 2.1    Summary Judgment Standard

"A motion for summary judgment is a contention that the material facts are undisputed and the movant is entitled to judgment as a matter of law. The party pursuing the motion must make an initial showing that the agreed-upon facts support a judgment in its favor." *Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund*, 778 F.3d 593, 601 (7th Cir. 2015) (citing Fed. R. Civ. P. 56(a), (c)(1); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986); *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001); *Logan v. Commercial Union Ins. Co.*, 96 F.3d 971, 978–79 (7th Cir. 1996)). In reviewing a motion for summary judgment, the Court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor." *King v. McCarty*, 781 F.3d 889, 895 (7th Cir. 2015) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *McGee v. Adams*, 721 F.3d 474, 480 (7th Cir. 2013)).

Where "the movant is seeking summary judgment on a claim as to which it bears the burden of proof, it must lay out the elements of the claim, cite the facts which it believes satisfies these elements, and demonstrate why the record is so one-sided as to rule out the prospect of a finding in favor of the non-movant on the claim." *Hotel 71*, 778 F.3d at 601 (citing *Reserve Supply Corp. v. Owens–Corning Fiberglass Corp.*, 971 F.2d 37, 42 (7th Cir. 1992); *United States v. Four Parcels of Real Property in Greene & Tuscaloosa Counties in State of Ala.*, 941 F.2d 1428, 1438 (11th Cir. 1991)). "If the movant has failed to make

this initial showing, the court is obligated to deny the motion." *Hotel 71*, 778 F.3d at 601–02 (citing *Johnson v. Hix Wrecker Serv., Inc.*, 651 F.3d 658, 662 (7th Cir. 2011) ("A party opposing summary judgment does not have to rebut factual propositions on which the movant bears the burden of proof and that the movant has not properly supported in the first instance."); *Johnson v. Gudmundsson*, 35 F.3d 1104, 1112 (7th Cir. 1994) (even an unanswered motion for summary judgment cannot be granted unless the movant has shown that the facts warrant judgment in its favor)).

### 2.2     Substantive Analysis

The Court is obliged to grant the defendants' motion for summary judgment and dismiss all of Ms. Moore's claims.[2]

#### 2.2.1     Ms. Moore Was Not Terminated on an Impermissible Ground

The Court will start with Ms. Moore's second claim: that the defendants terminated her participation in the Program on the impermissible ground that her voucher had expired.[3]

This claim fails because it rests on a faulty premise: that the defendants, in fact, terminated Ms. Moore's participation because her

---

[2]The Court acknowledges Ms. Moore's request that the Court strike the defendants' oversized brief in support of their motion for summary judgment. (Docket #72 at 7–8). That procedural error—which comes on the heels of the Court allowing the defendants to file an amended answer to avoid judgment on the pleadings caused by a typo (Docket #60)—is certainly concerning. But the Court will not strike the defendants' brief on that basis. The Court has never before warned parties that it would strike oversized briefs, and believes it would be unduly harsh to impose that punishment now. That is especially true, here, because Ms. Moore has had the opportunity to respond to the oversized brief in full.

[3]The parties have spent considerable effort briefing the issue of whether Ms. Moore had a protected property interest in her participation in the program. The Court will assume, *arguendo,* that she did.

voucher had expired. Even drawing all reasonable inferences in Ms. Moore's favor on this point, that clearly is not the case. Rather, Ms. Moore's participation in the program was terminated on the basis of her eviction. While the First, Second, and Third Letters offered shuffling reasons for the termination, one thing is clear: the last of those letters listed only the eviction as the basis for termination and the MCHA hearing officer affirmed Ms. Moore's termination on that basis. Regardless of everything happening in the periphery—the shifting reasons in the letters, Ms. Hunt's and other employees' shifting explanations—it is now clear that the final termination was based upon the eviction, as explained in the Third Letter and as affirmed by the MCHA hearing officers.

Furthermore, there can be little doubt that Ms. Moore's termination on the basis of her eviction was appropriate. To begin, there is no basis to doubt the judgment of eviction. There is a state-court judgment of eviction in place in Milwaukee County Case No. 2014SC012424, effective May 28, 2014. Ms. Moore attended the eviction hearing and did not appeal the eviction judgment. It remains perfectly valid, and this Court certainly cannot undo it. That eviction, meanwhile, gave MCHA cause to terminate Ms. Moore's participation in the Program. Under 24 C.F.R. § 982.552(b)(2), "[t]he PHA must terminate program assistance for a family evicted from housing assisted under the program for serious violation of the lease." Recently, the District of Minnesota held that "holding over at the expiration of a lease is a serious violation of the lease," that would require termination. *Perkins v. Metro. Council, Metro HRA*, 21 F. Supp. 3d 1006, 1010 (D. Minn. 2014) (citing *Wilhite v. Scott Cnty. Hous. & Redevelopment Auth.*, 759 N.W.2d 252, 256 (Minn. Ct. App. 2009)); *but see Eslin v. Hous. Auth. of Town of Mansfield*, No. 3:11-CV-134-JCH, 2013 WL 3279804, at *7 (D. Conn. June 27, 2013)

(concluding "that a genuine issue of material fact exists because a reasonable factfinder could find that failing to vacate a unit after a lease is terminated qualifies as a 'serious violation' of a lease"). In this case, MCHA's hearing officers appear to have viewed Ms. Moore's holding over her lease as a serious violation. (*See* Docket #36, Ex. 1 at 1 ("Participant violated the terms of her lease by holding over leading to eviction. Eviction due to a repeated or serious lease violations is a mandatory reason for termination of assistance…")). Assuming that it could be termed a serious violation, MCHA was required to terminate Ms. Moore's benefits under 24 C.F.R. § 982.552(b)(2). On the other hand, even if Ms. Moore's holding-over was not a serious violation requiring termination, the mere fact of her eviction gave MCHA the authority to terminate her benefits: "[t]he PHA may at any time…terminate program assistance for a participant…[i]f any member of the family has been evicted from federally assisted housing in the last five years." 24 C.F.R. § 982.552(c)(1)(ii). In short—without any regard to the expiration of Ms. Moore's voucher—MCHA was either required or, at least, entitled to terminate Ms. Moore's participation in the Program on the basis of her eviction, alone.

### 2.2.2 Ms. Moore Received Sufficient Process

The Court next turns to Ms. Moore's first claim: that the lack of a pre-termination hearing violated her rights under the Due Process Clause of the Fourteenth Amendment and HUD's regulations. In light of her eviction, Ms. Moore was not entitled to a hearing under either authority.

#### 2.2.2.1 Constitutionally Sufficient Process

First, under *Simmons v. Drew*, 716 F.2d 1160 (7th Cir. 1983), Ms. Moore had no constitutional right to a pre-termination hearing. In *Simmons*, the Seventh Circuit considered a situation remarkably similar to Ms. Moore's. *Id.*

One of the plaintiffs in *Simmons*, Andrea Williams, had been applied and accepted into the Program. *Id.*, at 1161–62. However, before she had located housing, MCHA terminated her participation in the program after finding that she had violated the terms of a previous lease. *Id.* at 1162.

> Shortly before Williams was expelled, a Wisconsin court evicted her from the rented dwelling she then occupied because it found that she had permitted more people to live there than the lease allowed. The court made its finding after a bench trial at which Williams appeared and had ample opportunity to present her version of the facts. Sharing living quarters with more people than a lease permits is a proper ground for expulsion from the rent assistance program, so that when the [MCHA] learned of the eviction, it expelled Williams. Since there is no reason to suppose that the [MCHA] is in a better position than a court to determine how many people are living together under one roof or that Williams was prevented from presenting fully to the court her version of the facts, the [MCHA] was not constitutionally required to afford her a second hearing before or after it decided to expel her.

*Id.* at 1163. The parallels to Ms. Moore's situation are clear: both Ms. Moore and the *Simmons* plaintiff had been found to have violated their leases by a court in front of whom they appeared and subsequently evicted. *Id.* The *Simmons* court found that the plaintiff's eviction hearing, alone, was a constitutionally adequate pre-termination hearing and that MCHA did not need to offer her another hearing. *Id.* Likewise, here, MCHA was in no better position than the evicting court to determine that Ms. Moore had violated the terms of her lease by holding over; MCHA was, thus, not constitutionally required to afford Ms. Moore a second hearing before or after deciding to expel her. *See id.*; *accord Medley v. City of Milwaukee*, 969 F.2d 312, 319 (7th Cir. 1992) (citing *Simmons*, 716 F.2d at 1163, and reaffirming principle that any process to which tenants were constitutionally due was satisfied through

state court eviction proceedings); *Colvin v. Housing Authority of City of Sarasota, Fla.*, 71 F.3d 864, 866–67 (11th Cir. 1996) (citing *Simmons*, 716 F.2d 1160, and finding that eviction hearing, alone, was all the process that the tenant was constitutionally due).

But the constitutionality of MCHA's termination based upon the eviction hearing, alone, does not end the inquiry; rather, the Court must also determine whether MCHA complied with the applicable regulations. "The sole issue in *Simmons* was the tenant's constitutional procedural due process rights." *Colvin*, 71 F.3d at 867 (citing *Simmons*, 716 F.2d 1160). Later-enacted federal regulations can—and do—impose additional notice and hearing requirements.

### 2.2.2.2 Sufficient Process Under Regulations

The regulations require MCHA to provide participants with notice and a hearing in certain cases. As relevant to this case, the notice and hearing are required "[i]n the cases described in paragraphs (a)(1)(iv), (v), and (vi) of this section." 24 C.F.R. §§ 982.555(a)(2), (c)(2) (using identical language). Of those paragraphs, (a)(1)(iv) is the only one that might apply: it requires an informal hearing when there has been "[a] determination to terminate assistance for a participant…because of the [participant]'s action or failure to act (see § 982.552)." 24 C.F.R. § 982.555(a)(1)(iv).[4] In turn, 24 C.F.R. § 982.552 offers various grounds for termination, including mandatory termination based upon eviction for a serious lease violation, 24 C.F.R. § 982.552(b)(2), and the entitlement to terminate based upon any other eviction from

---

[4] 24 C.F.R. § 982.555(a)(1)(v) deals with a situation in which the participant has been absent from the unit. Meanwhile, despite cross-references from other portions of the regulation, 24 C.F.R. § 982.555(a)(1)(vi) no longer exists within the regulation.

federally-assisted housing within the previous five years, 24 C.F.R. § 982.552(c)(1)(ii). The Court will presume that these grounds constitute a participant's "action or failure to act," so as to trigger the notice and hearing requirements of 24 C.F.R. §§ 982.555(a)(2) and (c)(2).

So, assuming that the notice and hearing requirements were triggered by MCHA's decision to terminate Ms. Moore from the program based upon her eviction, what did the regulations require? As to notice, under 24 C.F.R. § 982.555(c)(2), MCHA was required to provide Ms. Moore with "prompt written notice that [Ms. Moore] may request a hearing." That notice required: a brief statement regarding the basis for the decision; state that Ms. Moore could request an informal hearing; and state the deadline for Ms. Moore to request a hearing. 24 C.F.R. §§ 982.555(c)(2)(i–iii). As to a hearing, MCHA was required to provide Ms. Moore with "the opportunity for an informal hearing before…terminat[ing] housing assistance payments for [Ms. Moore] under an outstanding HAP contract."

MCHA provided the required "prompt written notice." MCHA issued the First Letter promptly. Though it was erroneously backdated, it was issued at most a few days after the listed termination date (and nowhere can the Court find a specific requirement that the notice be issued pre-termination). It also informed Ms. Moore that MCHA was terminating her benefits as a result of her eviction (in addition to her having allowed her voucher to expire); that she could request a hearing; and that, if she wished to request a hearing, she must do so within ten days. (Docket #67, Ex. 7). To be sure, there was quite a bit of back-and-forth between the parties after MCHA issued the First Letter; MCHA eventually issued two additional termination letters. But, ultimately, the First Letter satisfied the regulations: it provided prompt notice of the ultimate basis for termination of Ms.

Moore's benefits (eviction, as was ultimately the subject of the October 2, 2014, hearing) and informed Ms. Moore about the hearing process. Additionally, even if the First Letter did not satisfy 24 C.F.R. § 982.555(c)(2), the Third Letter did so. It included all of the required information (ground for termination, availability of hearing, and deadline for requesting the hearing). (Docket #67, Ex. 13). Furthermore, there is no guidance in the regulations as to the time limits implied by the word "prompt." *Lawrence v. Town of Brookhaven Dept. of Housing, Comm. Development & Intergovernmental Affairs*, No. 07-CV-2243, 2007 WL 4591845, at *18 (E.D.N.Y. Dec. 26, 2007) ("Nowhere in the HUD Regulations or Final Rule, however, is the word 'prompt' assigned an exact time or explained further."). Thus, while the Third Letter was issued nearly two months after the termination date (whether the Court treats that date as June 30, 2014, as listed in the Third Letter, or as June 18, 2014, as listed in the First and Second Letters), that delay is not clearly inappropriate. *See Lawrence*, 2007 WL 4591845 (finding a six-month delay did not violate the regulations). Throughout the period of delay, the parties were engaged in discussions, so clearly Ms. Moore was on notice of the grounds for termination and the potential for a hearing. In fact, that is precisely what the parties were discussing. So any further letter was purely *pro forma*. In light of this, the Court finds that the Third Letter, in addition to the First Letter, satisfied the requirements of 24 C.F.R. § 982.555(c)(2).

MCHA also satisfied the hearing requirements of 24 C.F.R. § 982.555(a)(2). To begin, the Court points out that MCHA did, in fact, hold a hearing on October 2, 2014. (*See* Docket #66, Ex. 12). So, to the extent that there is a requirement to hold a hearing at a participant's request, *see* 24 C.F.R. § 982.555(a) ("When a hearing is required."), MCHA satisfied that bare requirement.

The *timing* of the hearing presents a trickier issue. MCHA was required to "give the opportunity for an informal hearing before… terminat[ing] housing assistance payments…under an outstanding HAP contract." 24 C.F.R. § 982.555(a)(2). Thus, at first glance, it seems that MCHA may have violated this regulation by giving Ms. Moore a hearing on October 2, 2014, which was after the termination of payments on her behalf.

But that is not, in fact, the case; MCHA's hearing satisfied the requirements of the regulations. The terms of 24 C.F.R. § 982.555(a)(2) require a pre-termination hearing only where there is "an outstanding HAP contract." In this case, though, there was not an outstanding HAP contract at the moment of termination. "[F]ederal regulations…state that the HAP contract ends, and thus…payments are terminated, when the lease is terminated." *Eslin*, 2013 WL 3279804, at *9 (citing 24 C.F.R. §§ 982.309(b), 981.311(a), 982.451(a)(2); Chapter 15: Terminations of Assistance and HAP Contracts, HUD Housing Choice Voucher Program Guidebook (Apr. 2001), at 15–3 to 15–4; *Augusta v. Cmty. Dev. Corp. of Long Island, Inc.*, No. 07–CV–0361, 2008 WL 5378386, *2 n.5 (E.D.N.Y. Dec. 23, 2008)). And, here, the lease was clearly terminated, as Ms. Moore had been notified to vacate the premises (Docket #66, Ex. 5), received a letter terminating her lease (Docket #66, Ex. 6), and been judicially evicted for improperly holding over her unit (Docket #66, Exs. 7, 8). Thus, the HAP contract was not "outstanding," and MCHA did not need to hold a pre-termination hearing under 24 C.F.R. § 982.555(a)(2).

In short, Ms. Moore received all of the process that she was due, under both the constitution and the regulations. Accordingly, the Court is obliged to grant summary judgment in favor of the defendants and dismiss her first claim.

### 2.2.3 MCHA Did Not Violate Any Regulations in Issuing Ms. Moore a Voucher

In her third claim, Ms. Moore asserts that the County and Ms. Hunt "violated Ms. Moore's federal right regarding the issuance, term, and extension of her voucher," by:

    (1)    issuing a voucher without Ms. Moore's request (Docket #28 ¶ 64(a));

    (2)    failing to inform Ms. Moore that a voucher had been issued (Docket #28 ¶ 64(b));

    (3)    denying Ms. Moore's request for an extension of her voucher (Docket #28 ¶ 64(c));

    (4)    failing to issue a written response to Ms. Moore's request for an extension (Docket #28 ¶ 64(d)); and

    (5)    failing "to consider the factors listed in [MCHA's] Administrative Plan regarding when an extension should be granted" (Docket #28 ¶ 64(e)).

All of those sub-claims fail. Ms. Moore has not provided (and the Court cannot find) any regulation or other authority to support her position that MCHA could not issue a voucher without a request or was required to inform Ms. Moore immediately that a voucher had been issued, as would be necessary to prevail on the first or second of those sub-claims. As to the remaining three sub-claims, the decision to grant a voucher extension is purely discretionary. *See* 24 C.F.R. § 982.303(b)(1) ("At its discretion, the PHA may grant a family one or more extensions of the initial voucher term in accordance with PHA policy as described in the PHA administrative plan."). Ms. Hunt exercised discretion—considering Ms. Moore's lack of efforts to find new housing and the eviction on her record—in denying the extension request. (DPFF ¶ 71). Thus, the denial, alone, cannot support a request for relief, and the third sub-claim fails. The fourth sub-claim fails because Ms.

Hunt did, in fact, provide Ms. Moore with a written response to her request for an extension.[5] (DPFF ¶ 71). The fifth sub-claim fails because, assuming that MCHA was obligated to follow its Administrative Plan, it did nothing to violate the terms of its plan. Ms. Moore argues that MCHA "failed to consider the factors listed" in its Administrative Plan regarding when it should grant an extension. (Docket #28 ¶ 64(e)). But she does not identify which factors MCHA did not consider. In fact, the Administrative Plan seems to vest significant discretion in MCHA to grant or deny a request for an extension and does not list any "factors" that must be considered. (*See* Docket #67, Ex. 6 (providing that MCHA will approve extension requests only as a reasonable accommodation for a person with disabilities when "necessary due to reasons beyond the family's control, *as determined by the MCHA*," and providing a list of certain circumstances in which an extension *might* be warranted) (emphasis added). Nothing in the Administrative Plan appears to require MCHA to provide more specific reasons for its denial than it did. In short, in issuing Ms. Moore a voucher and in denying her an extension, MCHA did not do anything that violated the law.

For these reasons, Ms. Moore's third claim also fails.

### 2.2.4 Without an Underlying Violation, Ms. Moore's *Monell* Claim Fails

"[I]f no constitutional violation occurred in the first place, a *Monell* claim cannot be supported." *Petty v. City of Chicago*, 754 F.3d 416, 424 (7th Cir. 2014) (citing *Sallenger v. City of Springfield, Ill.*, 630 F.3d 499, 504 (7th Cir. 2010)). In other words, "a municipality cannot be liable under *Monell* when there is no underlying constitutional violation by a municipal employee."

---

[5] Furthermore, it is not clear that MCHA was even required to issue a written response; Ms. Moore has not supported that contention.

*Sallenger*, 630 F.3d at 504. As discussed extensively, above, the Court has found that Ms. Moore's individual claims all fail. Without an underlying violation, she cannot proceed on her *Monell* claim.

3.      CONCLUSION

For the foregoing reasons, the Court is obliged to grant the defendants' motion for summary judgment and dismiss this case in its entirety with prejudice. It must, accordingly, deny Ms. Moore's motion for partial summary judgment.

Accordingly,

IT IS ORDERED that the defendants' motion for summary judgment (Docket #60) be and the same is hereby GRANTED; this matter be and the same is hereby DISMISSED with prejudice; and

IT IS FURTHER ORDERED that the plaintiff's motion for summary judgment (Docket #55) be and the same is hereby DENIED.

The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 20th day of August, 2015.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge